## THE S. M. WHIPPLE.

*(District Court, D. California.   February 11, 1881.)*

1. BOATS AND VESSELS—LIEN FOR SUPPLIES.
    Under a state law which gives a lien on vessels plying the interior waters of the state for materials and supplies furnished to the vessel, for her use, and on her credit, where such supplies were ordered by the master appointed by the owner, the law confers a lien.

2. SAME—CHARTERED VESSEL—NOTICE TO DEALERS.
    Where the owner, who charters a vessel to third parties and under the terms of the charter-party appoints the master for the term of the contract, seeks to displace the lien given by statute for materials and supplies furnished the vessel by setting up a private agreement by which the master was deprived of the authority to create liens on the vessel, he should show by clear proof that explicit and unequivocal notice of the facts was given to persons dealing with the vessel.

*Milton Andros,* for appellant.

*G. M. Williams,* for claimant.

*G. D. Hall* and *W. W. Morrow,* for several intervenors.

HOFFMAN, D. J.   It is not denied that the supplies were furnished and the repairs made as set forth in the libel of the libelant and those of the intervenors.

At the time these debts were contracted, the vessel was under charter to G. A. Carleton and J. C. Spencer.   By the terms of the charter Carleton & Spencer agreed to pay "all bills for wages, coal, supplies, and wharfage, accruing against the steamer during the period of the

charter, and also all *liens that may have accrued against said vessel* since July 14, 1880," (they having had possession thereof since that date under a previous charter;) "and further, that they would sur-render and deliver the possession of the vessel   *   *   *   absolutely free and clear from all liens and incumbrances accruing, etc., be-tween June 14, 1880, and the time of such delivery." It was further agreed that the charterers should employ the pilot and engineer se-lected by the owner, the wages to be included in the wages to be paid by them," (the charterers,) "and the pilot so selected to be both pilot and captain, and *have charge of the boat.*"

The true and faithful performance by the charterers of the condi-tions of the charter-party was guarantied by one Charles Jost. The vessel was a domestic vessel, exclusively engaged in the navigation of the interior waters of this state.

By section 813, California Code of Civil Procedure, all steamers, etc., are made liable "(2) for supplies furnished for their use at the request of their respective owners, masters, agents, or consignees; (3) for work done or materials furnished in this state for their con-struction, repair, or equipment. Demands for these several causes constitute liens upon all steamers," etc.

It is contended by the advocate for the claimant that by the res-ervation of the right to appoint the master who was to "have charge of the boat," the general owner retained the possession of the vessel, with all the rights and responsibilities of the owner. The supplies were furnished at the request of the master.

The demands of the intervenors, the Phelps Manufacturing Com-pany, J. Boese, and Renton, Holmes & Co., are fully proved. The sup-plies and materials appear to have been furnished on the credit of the vessel, and without notice of the terms of the charter-party.

With regard to the claim of the Black Diamond Coal Company, an attempt is made to show that the president of the company was noti-fied by Mr. E. V. Joice, agent of the claimant, that the charterers, by the terms of the charter, were to pay for all supplies furnished the vessel, and that neither she nor her owner would be responsible.

Mr. Joice testifies that in June or July, when Carleton & Spencer were running the boat, he informed Mr. Cornwall, the president of the Black Diamond Coal Company, that the boat was to be returned free of charges, and that he must charge the supplies to the charterer. Mr. Cornwall replied that when he supplied a boat he always charged her with the supplies. Mr. Joice then requested him to let him know quietly how much was due, and whether the charterers paid up

promptly. Mr. Cornwall replied that there was nothing due then. Two or three weeks after this conversation, Mr. Cornwall furnished him (Mr. Joice,) with a statement, showing $200 to be then due for coal. He had but one conversation with Mr. Cornwall—he thinks it was in June, soon after the chartering of the boat; that Cornwall furnished but one statement. Mr. Joice subsequently returned to the stand, to state that on searching his papers he found a second note from Mr. Cornwall, which had escaped his recollection; but he is positive that he also received the first note spoken of by him.

Mr. Cornwall testifies that about the first of September, a few days before the note produced by Mr. Joice was written, he had a conversation with the latter, who inquired how much the charterers owed him. Mr. Cornwall replied that he didn't know, but would send the account to him. Mr. Joice said the boat was chartered, but they had good security. He supposed they (the charterers) would pay their bills, but he didn't want the boat to get too far behind. No notice was given him (Mr. Cornwall) not to trust the boat, but Mr. Joice wanted him to press the parties. Mr. Cornwall states, that this was the first time he knew that the boat was chartered. He did not understand Mr. Joice as giving him notice. If he had, he would at once have given orders not to supply the boat. He further states that his invariable practice is to keep copies of all his correspondence on business matters; that he finds a copy of the second note written by his book-keeper, by his orders, and that he gave him instructions with regard to writing but once. In this he is corroborated by Mr. Scott, his book-keeper. Mr. Scott states that he is positive there was no conversation between Mr. Joice and himself in June or July; that there was only one conversation—the one that directed the note of September 18th, written some 10 days subsequently.

I have no means of determining, as between these two very respectable gentlemen, whose memory has proved treacherous. Intentional misstatement I cannot impute to either. If Mr. Cornwall had not denied so positively that any conversation occurred in June or July, and that any note was written in consequence, I should have surmised that Mr. Joice did not notify Mr. Cornwall as explicitly as he thinks he did, or intended to do; at all events, that Mr. Cornwall did not so understand him. But the conflict is not merely as to the purport of the conversation, but as to its occurrence. Mr. Joice is unable to produce the first note, but Captain Wright, the claimant, testifies that in August Mr. Joice showed him a note stating that the boat was in debt $200 for coal. On the other hand, Mr. Cornwall

and Mr. Scott are positive that no note of that kind could have been written "without its getting on the letter-book."

Under these circumstances, I must endeavor to arrive at a decision by attempting to estimate the probabilities of the case; and if these afford no reliable guide, and the testimony is found to be equally balanced and irreconcilably conflicting, I must determine against the side on which rests the affirmative of the issue or the burden of proof. It does not appear that the decision of this court in the case of *The Schooner Columbus*, 5 Sawy. 487, was known to any of the parties. In that case it was held that no lien exists under the boats and vessels act of this state in favor of a domestic material man who has supplied a vessel in her home port at the request of the master, after having been notified by the owner that she had been let to the master to be run on shares, and to be manned and victualed by him, and that if supplies be furnished her, it must be exclusively on his personal credit. The point was new, and was in that case first presented to any court in this state. I am not aware whether the decision has met with general approval.

Had it been known to the parties, and accepted as the law, the probability that they would have taken steps to bring themselves within it by notifying the supply-men of the terms of the charter, would be appreciably enhanced.

2. The boat had been long running on the waters of this state. Her owner was well known, and had had dealings with the libelant and the intervenors for a considerable period. To neither of the latter did he give any notice of his contract with the charterers, until at or near the expiration of the last charter. If he or his agent had intended to notify one of the persons with whom he had been dealing, why not extend the notice to all? It seems probable that he would have done so.

3. The owner does not appear to have thought that he had protected himself and his vessel from liability. When executing the last charter, August 18, 1880, (and it was while this charter was running that the greater part of the coal was furnished,) he takes the guaranty of a third party that the vessel shall be delivered free "from all liens accruing between June 14, 1880, (the date of the first charter,) and the completion of the present charter." He seems therefore to have supposed, not only that liens might be created, but that they might already exist.

4. It seems improbable that if Mr. Cornwall had received or understood the notice in question, he would have persisted in furnishing

supplies on the credit of the vessel. In so doing, he would not only be running a great risk as to the payment by the boat or her owner, but would be committing a virtual fraud upon an old customer and acquaintance.

I am, disposed to think that these considerations have sufficient weight to show to which side the trembling balance in which the testimony is to be weighed should incline.

But if not, then the case must be decided by applying the rule that he on whom it rests to establish a certain state of facts, must do so by a preponderance of proofs. The rule is peculiarly applicable in this case. The supplies were furnished to the vessel for her use and on her credit. They were ordered by the master appointed by the owner. In such cases the law of this state confers a lien. He who would displace it by setting up a private agreement between himself and a third party, by which the master was deprived of the authority to create liens on the vessel, should show by clear proofs that explicit and unequivocal notice of the facts was given to persons dealing with the boat; and especially to those who had for a long time previously been in the habit of supplying her on her credit and that of her owners. It cannot be said that clear proofs of such a notice have been furnished in this case. It may be added that by this decision no practical injustice is done.

If the security taken by the owner is adequate, it is more equitable to compel him to look to it for his indemnity, than to deprive the supply-men of all remedy except a fruitless suit *in personam* against insolvent charterers.

A decree must be entered for the amounts claimed in the libels, with the deductions admitted at the hearing.